# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DORIS A. BALL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00002 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case for further development consistent with this Memorandum Opinion.

## I. Background and Standard of Review

Plaintiff, Doris A. Ball, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003).  Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:05-cv-00002-PMS   Document 17   Filed 09/19/05   Page 1 of 21   Pageid#: 85

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ball protectively filed initial applications for DIB and SSI on or about November 12, 1999, alleging disability as of September 15, 1999, based on a mental breakdown, depression, a hernia, arthritis and a fractured hip. (Record, ("R."), 57-60, 75, 112, 222-24.) Ball's claims were denied both initially and on reconsideration. (R. at 50-52, 53, 54-55, 226-28, 230-31.) Ball requested a hearing before an administrative law judge, ("ALJ"), (R. at 56), and this hearing was held on November 20, 2000, at which Ball was represented by counsel. (R. at 30-45.) By decision dated January 21, 2001, the ALJ denied Ball's claims. (R. at 16-23.) Thereafter, Ball pursued her administrative appeals, (R. at 6), but the Appeals Council denied her request for review. (R. at 4-5.) She then filed a civil action in this court seeking review of the ALJ's unfavorable decision, which stood as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). By order dated March 13, 2002, this court remanded Ball's claims for further development regarding her alleged mental impairment. (R. at 268.) The Appeals Council remanded the case on April 8, 2002. (R. at 3A, 266-67.) Thereafter, Ball protectively filed subsequent applications for DIB and SSI on January 23, 2001, alleging disability as of September 15, 1999, based on depression, a nervous breakdown, insomnia, anhedonia and an inability to

concentrate. (R. at 337-39, 350, 391, 548-51.) These claims also were denied both initially and on reconsideration. (R. at 328-30, 331, 333-34, 554-55.) These applications were combined with the November 12, 1999, applications, and a hearing was held on November 7, 2002, at which Ball was represented by counsel. (R. at 557-86.)

By decision dated November 27, 2002, the ALJ partially denied Ball's claims. (R. at 248-56.) The ALJ found that Ball met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 254.) The ALJ found that Ball had not engaged in substantial gainful activity since September 15, 1999. (R. at 254.) The ALJ also found that Ball had a severe impairment, namely arthritis, but he found that Ball did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 254.) The ALJ further found that Ball's allegations regarding her limitations prior to June 14, 2001, were not credible, but he found that her allegations of disabling arthritis beginning June 14, 2001, were credible. (R. at 255.) The ALJ concluded that, prior to June 14, 2001, Ball retained the residual functional capacity to perform the exertional requirements of light work.[1] (R. at 255.) He found that since June 14, 2001, Ball retained the functional capacity to perform sedentary work.[2] (R. at 255.) Therefore, the ALJ found that Ball was able to perform her past relevant work as a cashier prior to June 14, 2001. (R. at 255.) Thus, the ALJ found

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2005).

that Ball was disabled commencing June 14, 2001, but not prior thereto.  (R. at 255.)  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his decision, Ball pursued her administrative appeals, (R. at 241), but the Appeals Council denied her request for review.  (R. at 232-34.)  Ball then filed this action seeking review of the ALJ's partially unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. §§ 404.981, 416.1481 (2005).  This case is before this court on Ball's motion for summary judgment filed June 2, 2005, and the Commissioner's motion for summary judgment filed August 4, 2005.

## II. Facts and Analysis[3]

Ball was born in 1940, (R. at 57, 222, 337, 548), which classifies her as a person of advanced age under 20 C.F.R. §§ 404.1563(e), 416.963(e) (2005).  Ball has a high school education and past relevant work experience as a cashier.  (R. at 76, 81, 351, 356.)

At her November 7, 2002, hearing, Ball testified that her emotional difficulties began interfering with her ability to work in 1997.  (R. at 561.)  Prior to that time, she stated that she was abused by her husband until their divorce in 1982 and by her son until approximately five years prior to the hearing.  (R. at 561-63.)  Ball testified that since her initial hearing in November 2000, her psychological problems had worsened.  (R. at 563.)  She stated that she had anxiety attacks all of the time, which had worsened since her initial hearing, and that she could not get out of bed because she

---

[3]Because Ball contests only the ALJ's findings regarding an alleged mental impairment, only the medical evidence relevant to that issue will be discussed.

"smothered." (R. at 563-64.) Ball stated that she began experiencing these attacks before she stopped working in 1999. (R. at 76, 563.) She stated that she sometimes became very angry during these attacks and noted that she sometimes experienced crying "jags." (R. at 566-67.) However, she stated that the anger was overtaking the crying for the most part. (R. at 567.) Ball testified that she was afraid she would hurt people if she had to be around them for long periods. (R. at 564.) She stated that she had experienced crying spells for years and that she began experiencing memory difficulties during the last two years that she worked. (R. at 568.)

Ball testified that she put forth her best effort on psychological testing. (R. at 569.) She stated that she sometimes felt desperate and had thoughts of suicide. (R. at 570.) Ball stated that she did not think that her mental condition could get any worse. (R. at 570.) However, she stated that she stopped going to counseling because a counselor told her that there was nothing wrong with her, so she did not see the benefit in returning. (R. at 570-71.)

Thomas Schacht, Psy.D., a psychological expert, also was present and testified at Ball's second hearing. (R. at 571-83.) Schacht testified that there could be evidence of an impairment that met or equaled a listed impairment or of a severe impairment that caused significant work dysfunction prior to January 21, 2001. (R. at 572.) However, he noted this would depend on the court's findings regarding background factors and credibility. (R. at 572.) Schacht noted that the record showed a long history of intermittent treatment for psychological crises. (R. at 572.) Notes from Ball's primary care physician from the mid-1980s showed episodes of severe symptoms associated with her divorce, her house burning down, being abused by her son and fearing that her son would kill her if she put him out of the house. (R. at 572.)

-5-

Schacht further stated that the record showed noncompliance with treatment. (R. at 573.) Schacht testified that Ball's testimony was more typical of post-traumatic stress disorder, ("PTSD"), and major depression with rage attacks than anxiety. (R. at 573.) However, he noted that no examiner had diagnosed PTSD. (R. at 583.)

Schacht testified that Ball's full-scale IQ score of 64 was inconsistent with school records, which showed that she graduated and ranked in the middle of her class, which would likely place her in the average to low average range of intellectual functioning. (R. at 573.) He noted that the only possible explanation other than malingering would be dementia, which no treating source had diagnosed. (R. at 573.) Thus, he opined that the most likely hypothesis for Ball's full-scale IQ score of 64 was her failure to give her best effort. (R. at 580.)

Schacht noted that on May 14, 2002, psychologist Lanthorn concluded that Ball was mentally retarded, but Schacht opined that such a diagnosis was not supported by the record. (R. at 574-75.) Nonetheless, Schacht testified that if Ball's testimony were deemed credible, she probably would meet the listing for major depression with post-traumatic features, which would be both §§ 12.04 and 12.06. (R. at 577.) However, Schacht testified that the record did not reveal that Ball suffered from a severe mental impairment that lasted for 12 continuous months prior to January 21, 2001, because of Ball's substantial noncompliance with treatment. (R. at 579.) He noted that Ball's absence from treatment could be a product of her impairment. (R. at 579.)

In rendering his decision, the ALJ reviewed records from Dr. R. Michael Moore, M.D.; Dr. H.H. Bockian, M.D.; Holston Child and Family Counseling; B.

Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna Abbott, M.A., a licensed psychological examiner; Howard S. Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; Charles M. Tucker, Ph.D., a state agency psychologist; Dr. Randall Pitone, M.D.; Tara Wells, R.N.; and Dr. Jai Varandani, M.D.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-7-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Ball argues that the ALJ erred by failing to address the opinions of psychologist Leizer. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 7-9.) She also argues that the ALJ erred by failing to find that she suffered from a severe mental impairment prior to June 14, 2001, and that he improperly substituted his judgment for that of licensed mental health professionals. (Plaintiff's Brief at 10-13.)

-8-

The regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted). For the following reasons, I find that substantial evidence does not support the ALJ's finding that Ball did not suffer from a severe mental impairment prior to June 14, 2001.

The record reveals that Ball sought mental health counseling as early as 1983, following a divorce from an abusive husband. (R. at 403-06.) At that time, Dr. H.H. Bockian, M.D., diagnosed her with an adjustment disorder with mixed emotional features and dependent personality disorder. (R. at 399.) Ball was seen by Dr. R. Michael Moore, M.D., from June 1986 to October 4, 2000. (R. at 197-221, 407-36.) During this time period, Ball was diagnosed with depressive neurosis, severe, (R. at 221, 420), tension, (R. at 220, 419), and depression. (R. at 119-20, 202, 205, 207, 210, 407-09, 413-14, 417, 436.) She was placed on Xanax, (R. at 120, 221, 420), Prozac, (R. at 119, 207, 217, 408, 414, 416-17), Paxil, (R. at 205, 407, 413), and

-9-

Klonopin. (R. at 120, 409.) It was noted that Ball had not taken her medications as prescribed, particularly her Prozac. (R. at 202, 205, 220, 419.) On September 22, 1999, Ball complained that she could not concentrate, that she stayed upset and that she could not sleep or eat. (R. at 120.) On April 18, 2000, she was diagnosed with depression and was prescribed Prozac. (R. at 408.) On October 4, 2000, Ball was diagnosed with severe and debilitating depression, among other things. (R. at 172.) She was prescribed Paxil. (R. at 172.) Dr. Moore noted that Ball suffered from "severe, severe depression" and dysthymia, and he opined that she was totally disabled. (R. at 175, 436.)

Ball was seen by Dr. Randall Pitone, M.D., and Tara Wells, R.N., for counseling from September 24, 1999, to October 16, 2000. (R. at 177-93, 437-72.) Therapy focused on Ball's stress related to an abusive, alcoholic son, (R. at 193, 448), and caretaking responsibilities for her elderly mother. (R. at 190, 444.) A letter to Disability Determination Services on December 22, 1999, reported Ball's diagnosis as depressive disorder, not otherwise specified, and a then-current Global Assessment of Functioning, ("GAF")[4] score of 50.[5] (R. at 132, 454.) On January 19, 2000, Ball stated that she cared for her ill mother from 10 to 12 hours each day. (R. at 190, 455.) Ball was given a phone number she might call to obtain help in caring for her mother. (R. at 190, 455.) She reported frequent crying spells, decreased appetite and difficulty sleeping. (R. at 190, 455.) On January 20, 2000, it was noted that Ball had been

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, (DSM-IV), 32 (American Psychiatric Association 1994).

[5]A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

noncompliant in keeping her appointments. (R. at 189, 453.)

On January 27, 2000, Ball saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a mental status evaluation. (R. at 133-37.) Lanthorn noted that Ball had a blunted affect and a depressed mood. (R. at 133.) She reported that she had to take care of her ill mother. (R. at 134.) Ball complained of short- and long-term memory problems. (R. at 135.) Her level of abstraction was deemed fair. (R. at 135.) Some concentration and attention difficulties were noted. (R. at 135.) Ball reported regular suicidal ideations. (R. at 135.)

Lanthorn noted no significant limitation with regard to Ball's ability to understand and remember. (R. at 136.) He noted that she was likely capable of remembering locations and work-like procedures. (R. at 136.) Lanthorn further noted that Ball was able to understand and remember simple or detailed instructions. (R. at 136.) However, he noted significant limitations in her ability to sustain concentration and persistence due to some confusion, stating that carrying out instructions or sustaining routine activities might be difficult. (R. at 136-37.) Due to Ball's depression, Lanthorn opined that she would likely be distracted by others. (R. at 137.) No significant limitations with regard to social interaction were noted. (R. at 137.) Furthermore, Lanthorn opined that Ball could accept instructions and respond appropriately to criticisms from supervisors. (R. at 137.) Some minor limitations with regard to adaptation were noted. (R. at 137.) In particular, Lanthorn opined that responding appropriately to changes in the work setting might be difficult due to concentration problems and depression. (R. at 137.) Finally, Lanthorn opined that Ball might have difficulty setting realistic goals and making plans independent of others due to some dependency. (R. at 137.) Lanthorn diagnosed Ball with major

-11-

depressive disorder, single episode, moderate, dependent personality disorder and a then-current GAF of 40-45.[6]  (R. at 137.)

On February 9, 2000, Howard S. Leizer, Ph.D., a state agency psychologist, completed a mental residual functional capacity assessment.  (R. at 138-41.)  Leizer found that Ball was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday or workweek without interruptions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others.  (R. at 138-39.)

The same day, Leizer completed a Psychiatric Review Technique Form, ("PRTF").  (R. at 142-51.)  He found that Ball suffered from a severe affective disorder that was not expected to last for 12 months.  (R. at 142.)  Specifically, Leizer concluded that Ball suffered from bipolar disorder.  (R. at 145.)  He found that Ball was moderately restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, occasionally suffered from deficiencies of concentration, persistence or pace and never experienced episodes of deterioration or decompensation in work or work-like settings.  (R. at 149.)  Charles M. Tucker,

---

[6]A GAF of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...."  DSM-IV at 32.

Case 2:05-cv-00002-PMS   Document 17   Filed 09/19/05   Page 12 of 21   Pageid#: 96

Ph.D., a state agency psychologist, reviewed Leizer's PRTF, and diagnosed Ball with major depressive disorder, single episode, and dependent personality disorder. (R. at 157.)

On April 3, 2000, Ball failed to keep an appointment for a psychiatric evaluation with Holston Child and Family Counseling. (R. at 187.) On April 13, 2000, it was noted that she had continued to be noncompliant with treatment. (R. at 184.) On April 24, 2000, Ball reported that she was caring for her mother 24 hours a day. (R. at 183.) At that time, Ball stated that Prozac was helping "to some degree." (R. at 183.) Ball again was advised of an agency that she could contact to obtain help in caring for her mother. (R. at 183.) However, on July 5, 2000, Ball again stated that she could not keep her appointments because she had to continuously care for her mother. (R. at 182.) She was advised to continue therapy, even if by telephone. (R. at 182.) Ball was diagnosed with major depressive disorder, recurrent, severe. (R. at 177-78, 180-81.) It was noted that she continued to be noncompliant in keeping her appointments, stating that she had to care for her mother. (R. at 179.) Ball was informed that her file would be closed if she did not contact the office regarding treatment. (R. at 179.)

On June 30, 2000, Lanthorn completed a Mental Assessment Of Ability To Do Work-Related Activities. (R. at 166-68, 511-13.) He found that Ball had a fair ability to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 166-67, 511-12.) In all other areas of adjustment, Lanthorn opined that Ball retained either an unlimited/very good ability or a good ability. (R. at 166-67, 511-12.)

On October 16, 2000, Ball was informed by Holston Child and Family Counseling that her chart was being closed due to lack of follow-up. (R. at 177.) However, she was further informed that she could reinitiate services if she chose to do so. (R. at 177.)

On May 17, 2001, psychologist Lanthorn and Donna Abbott, M.A., a licensed psychological examiner, saw Ball for a consultative examination. (R. at 501-05.) Lanthorn and Abbott opined that Ball was not putting forth her best effort in answering questions. (R. at 503.) Ball reported that she became quite angry and experienced crying spells. (R. at 503.) She stated that medication helped some, but she admitted to not taking it regularly due to the expense. (R. at 503.) Ball reported staying with her mother during the day and watching after her. (R. at 504.) Ball was diagnosed with dysthymic disorder, mild to moderate, late onset, dependent personality features and a then-current GAF score of 65.[7] (R. at 504-05.)

Lanthorn and Abbot opined that Ball was not limited in her ability to understand and remember and they placed her intellectual functioning in the low average range. (R. at 504.) Moreover, they opined that her ability to sustain concentration and persistence did not appear to be significantly limited despite her subjective reports. (R. at 504.) Her social interaction did not appear to be significantly limited, and Lanthorn and Abbott opined that Ball should be able to meet basic standards of neatness and cleanliness, as well as to interact appropriately with others. (R. at 504-05.) Her general adaptation skills also did not appear to be

---

[7]A GAF of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful relationships." DSM-IV at 32.

significantly limited. (R. at 505.) Lanthorn and Abbott noted that, despite Ball's complaints of nervousness, she was not involved in any psychiatric treatment and only took medications sporadically when she had the funds to buy them. (R. at 505.) They opined that counseling might be helpful in assisting her in dealing with chronic relationship problems. (R. at 505.)

The remainder of the psychological evidence contained in the record relates to the time period on or after June 14, 2001, when the ALJ found Ball to be disabled. Ball does not argue that the ALJ erred by failing to find that she suffered from a severe mental impairment during this time period. I note that none of these treating or examining sources related his or her findings to the time period prior to June 14, 2001. Nonetheless, for the sake of completeness of the evidence, I will now address it.

On June 14, 2001, Ball saw Dr. Jai Varandani, M.D., for complaints of depression, among other things. (R. at 514-19.) She reported that the previous summer she became so depressed, she ran her car into a tree in an attempt to kill herself. (R. at 514.) She reported that she was taking Prozac, but had to depend entirely on physician samples. (R. at 515.) Ball's memory was rated as fair. (R. at 516.) She was diagnosed with depression. (R. at 516.) Dr. Varandani noted that Ball definitely "seem[ed] to have chronic depression," a diagnosis supported by her lack of energy, lack of interest, inappropriate crying, insomnia and history of attempting to hurt herself. (R. at 516.) Good psychiatric treatment and long-term management were recommended. (R. at 516.)

On July 18, 2001, psychologist Leizer completed a PRTF, finding that Ball had

an affective disorder, but that a residual functional capacity assessment was necessary. (R. at 520-35.) Leizer concluded that Ball was only mildly restricted in her activities of daily living, but experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 530.) Leizer found Ball's subjective allegations only partially credible. (R. at 535.) He concluded that she could perform simple, unskilled work. (R. at 535.) This assessment was affirmed by Julie Jennings, Ph.D., another state agency psychologist. (R. at 520.)

The same day, Leizer completed a Mental Residual Functional Capacity Assessment, concluding that Ball was moderately limited in her ability to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods. (R. at 536-38.) In all other areas, Ball was deemed not significantly limited, with the exception of the ability to accept instructions and respond appropriately to criticism from supervisors, for which there was no evidence of limitation. (R. at 536-37.) This assessment also was affirmed by state agency psychologist Jennings. (R. at 538.)

On May 9, 2002, Ball again saw Dr. Moore with complaints of nervousness. (R. at 305.) She had a low mood and a flat affect, and Dr. Moore described her as very depressed and very anxious. (R. at 305.) He diagnosed severe depression and an anxiety disorder with panic attacks. (R. at 305.) Ball was given samples of Prozac and Xanax. (R. at 305.) Dr. Moore opined that Ball was totally and permanently disabled for a lifetime. (R. at 305.)

Ball again saw Lanthorn on May 14, 2002, at her attorney's referral. (R. at 307-16.) Lanthorn noted that Ball presented in an extremely flat and blunted fashion. (R.

at 308.)  He described her mood as severely depressed with signs of anxiety and tension.  (R. at 308.)  Ball reported impaired memory for the previous four to five years and stated that she found it almost impossible to concentrate and to persist at tasks with any success.  (R. at 310.)  Ball reported significant depression, and Lanthorn described her as despondent.  (R. at 310.)  Ball noted that she sometimes became so frustrated and angry that she would like to "...just hurt anybody that's nearby."  (R. at 310-11.)  She reported that she did not think counseling would help her because it was "too late."  (R. at 311.)  She further reported experiencing panic attacks.  (R. at 311.)

Lanthorn administered the Wechsler Adult Intelligence Scale - Third Revision, ("WAIS-III"), on which Ball obtained a verbal IQ score of 70, a performance IQ score of 63 and a full-scale IQ score of 64, placing her in the extremely low range of intellectual functioning.  (R. at 311.)  The Minnesota Multiphasic Personality Inventory - Second Edition, ("MMPI-2"), test also was administered.  (R. at 312.) Lanthorn noted an elevated F score, possibly indicating an attempt to derive secondary gain.  (R. at 312.)  However, Lanthorn further noted that such an elevation could represent a plea for help by an extremely anxious individual.  (R. at 312.)  In any event, Lanthorn noted that Ball's test results indicated significant psychological difficulties and a limited ability to cope with stress.  (R. at 312.)  Overall, Lanthorn found Ball's test results valid.  (R. at 312.)  Ball was diagnosed with mild mental retardation, major depressive disorder, recurrent, severe, generalized anxiety disorder and a then-current GAF score of 45. (R. at 314-15.) Lanthorn concluded that Ball had difficulties with concentration, memory loss, initiating and persisting at tasks, utilizing judgment in an effective manner and proneness to distractibility and to social withdrawal and isolation.  (R. at 314.)  Lanthorn opined that Ball had severe

Case 2:05-cv-00002-PMS   Document 17   Filed 09/19/05   Page 17 of 21   Pageid#: 101

limitations in her overall adaptability skills. (R. at 314.) He recommended mental health counseling. (R. at 314.)

On May 16, 2002, Lanthorn completed a Mental Assessment Of Ability To Do Work-Related Activities, concluding that Ball had a good ability to understand, remember and carry out simple job instructions, a fair ability to follow work rules, to function independently, to understand, remember and carry out detailed job instructions and to maintain personal appearance and a poor or no ability in all other areas of adjustment. (R. at 317-19.)

On September 3, 2002, Dr. Moore completed a Mental Assessment Of Ability To Do Work-Related Activities, finding that Ball was moderately limited in her ability to understand, remember and carry out simple instructions, to interact appropriately with supervisors and to interact appropriately with co-workers. (R. at 322-23.) He found that she was markedly limited in her ability to make judgments on simple work-related decisions, to interact appropriately with the public, to respond appropriately to work pressures in a routine work setting and to respond appropriately to changes in a routine work setting. (R. at 322-23.) Lanthorn concluded that Ball was extremely limited in her ability to understand, remember and carry out detailed instructions. (R. at 322.) Lanthorn noted that his findings were supported by Ball's depression and anxiety disorder. (R. at 322-23.)

It is clear from the treatment notes contained in the record that Ball's mental impairment resulted in greater than minimal restrictions on her work-related abilities, as evidenced by nearly every source that examined her during the period prior to June 14, 2001. Furthermore, Ball's mental impairment was deemed significant enough to

-18-

warrant treatment with various psychotropic medications, including Prozac and Xanax, as well as mental health counseling. I do not give great credence to the Commissioner's noncompliance argument because there is evidence in the record that Ball missed counseling sessions because she had to care for her ill mother and she sporadically followed her prescribed medication regime because she could not bear the expense. According to 20 C.F.R. §§ 404.1530(b), 416.930(b), if a claimant does not follow prescribed treatment without a good reason, she will not be deemed disabled. The Fourth Circuit has held that a claimant's inability to pay for treatment constitutes a good reason for not following such treatment. *See Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). Moreover, despite questions regarding whether Ball put forth her best effort on psychological testing, all scores were deemed valid. Despite issues of noncompliance and possible malingering, the fact remains that Ball consistently complained of and sought medical treatment for her depression and anxiety beginning in the early to mid-1980s continuing through at least late 2002. The fact also remains that every psychological expert who addressed the issue placed more than minimal limitations on her work-related mental abilities during the period prior to June 14, 2001. (R. at 138-39, 149, 166-67, 511-12, 516.)

While the psychological evidence relating to the time period on and after June 14, 2001, is not directly relevant to the time period prior thereto, I do note that more than minimal restrictions continued to be imposed on Ball's work-related mental abilities through at least September 2002, thus, suggesting a continuing severe mental impairment.

-19-

Ball also argues that the ALJ erred by failing to address the opinions of psychologist Leizer. (Plaintiff's Brief at 7-9.) It is well-settled that the ALJ has a duty to weigh the evidence. *See Gordon*, 725 F.2d at 235. Specifically, the ALJ must indicate explicitly that all relevant evidence has been weighed and its weight. *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reaches are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, the ALJ did not state the weight that he was according to any of the medical evidence of record. For this reason, as well as the reasons cited above, I find that substantial evidence does not support the ALJ's failure to find that Ball suffered from a severe mental impairment prior to June 14, 2001.

## III. Conclusion

For the foregoing reasons, Ball's motion for summary judgment and the Commissioner's motion for summary judgment will be denied, the decision of the Commissioner denying benefits prior to June 14, 2001, will be vacated and the case will be remanded to the Commissioner for further consideration of the effect of Ball's severe mental impairment on her ability to work prior to June 14, 2001.

-20-

An appropriate order will be entered.

DATED:     This 19th day of September, 2005.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE